FARM MORTGAGE & LOAN COMPANY, Appellant, v. MARTIN et al, Respondents.

(214 N. W. 816.)

(File No. 5516. Opinion filed July 9, 1927.)

1. **Bills and Notes—Evidence of Fraud and Duress Inducing Land Contract, or Rescission Based on Fraud, Held Insufficient to Raise Questions for Jury.**

Evidence of alleged fraud, duress, or rescission based on fraud, inducing purchase of land by members of land excursion, held insufficient to raise questions for the jury, as respects notes given to land company.

2. **Trial—Instruction that Defense Was Fraud, Quoting Verbatim from Redundant Answer Allegations Unsupported by Evidence, Held Reversible Error.**

Instruction stating that one of defenses to action on notes given in purchase of land was fraud, quoting verbatim and at length from redundant answer, many allegations of which were unsupported by evidence, held reversible error, since jury is entitled to have presented clear-cut issues supported by evidence.

3. **Appeal and Error—Trial—Court Is Not Authorized to Submit to Jury Issue Unsupported by Evidence, and Such Submission Is Reversible Error.**

A court is not authorized to submit to a jury an issue as to which there is no evidence; such submission constituting reversible error.

4. **Bills and Notes—Note Is Negotiable, Notwithstanding Provision for Higher Rate of Interest from Date if Not Paid at Maturity (Negotiable Instruments Act, § 2).**

A note is negotiable within the Negotiable Instruments Act, § 2 (Rev. Code 1919, § 1706), notwithstanding a provision that it is to bear interest at 6 per cent from date if paid when due, and, if not paid when due, 8 per cent.

Note.—See, Headnote (1), American Key-Numbered Digest, Bills and Notes, Key-No. 537(4), 8 C. J. Sec. 1382; (2) Trial, Key-No. 233(2), 38 Cyc. 1610, 1618; (3) Appeal and error, Key-No. 1066, 4 C. J. Sec. 3016; (3) Trial, Key-No. 252(1), 36 Cyc. 1617, 1618; (4) Bills and Notes, Key-No. 158, 8 C. J. Sec. 253.

As to negotiability of note as affected by provision in relation to interest or discount, see annotation in 2 A. L. R. 139; L. R. A. 1915B, 1217; 3 R. C. L. 901; 1 R. C. L. Supp. 913.

Instruction not supported by the evidence is erroneous, see 14 R. C. L. 786; 3 R. C. L. Supp. 285; 4 R. C. L. Supp. 919; 5 R. C. L. Supp. 777; 6 R. C. L. Supp. 831.

For annotations Rev. Code 1919, Sec. 1706, see U. L. A., Vol. 5, pg. 25.

Appeal from Circuit Court, Deuel County; HON. W. N. SKINNER, Judge.

Action by the Farm Mortgage & Loan Company, a corporation, against C. J. Martin and others, as executors of the last will and testament of John P. Coffey, deceased. Judgment for defendants, and plaintiff appeals. Reversed and remanded.

*Sherin & Sherin,* of Watertown, for Appellant.

*Law. Dobie & Law,* of Clear Lake, and *Canfield & Michael,* of Luverne, Minn., for Respondents.

MISER, C. Appellant brought this action to recover on three promissory notes given by one John P. Coffey and Mildred C. Coffey to the San Benito Land Company. The defendants are the executors under the will of John P. Coffey, deceased. Mildred C. Coffey is the widow of John P. Coffey and one of the executors under his will. Coffey and wife made a trip to San Benito, Tex., in February, 1922. They were members of an excursion party gotten up by the San Benito Land Company, which party was personally conducted by one Elsinger, one of its officers. After being at San Benito two days and one night, living in the land company's car, during the course of which time they were taken by auto to see certain lands, John P. Coffey purchased a tract for $18,000, executing a contract of purchase and the three notes in suit, aggregating $9,000, as earnest money payments on the purchase price thereof. Of these notes, one for $1,000 was due on February 26, 1922; one for $4,000 was due eighteen months from date; and one for $4,000 was due in one year from date. These notes each contained the provision, "with interest at the rate of 6 per cent per annum from date if paid when due, if not paid when due, 8 per cent from date."

The defendants, while admitting the execution of these three notes, allege that the signature of the decedent was obtained under circumstances which are set out at length in their answer, but which may be abbreviated somewhat as follows: That Coffey, at the time he signed the three notes, was suffering from a complication of diseases, as a result of which his mind had also become weakened, whereby he "was easily influenced by glib-tongued

strangers offering opportunities of great pecuniary profit"; that he was incapable of transacting his own business affairs with ordinary discretion, and that, on the trip to Texas, a representative of the San Benito Land Company "constantly remained with him and exercised constant surveillance over him, and did not allow Coffey to converse with any one in San Benito regarding the value of lands, or to obtain any other information regarding the character, quality, or value of lands in that country," with which he was totally unacquainted; that Coffey relied upon what they said regarding the value of the land; and that, "taking advantage of his physical and mental infirmities," they falsely and fraudulently stated that this particular tract of land was "then and there of the fair cash market value of $18,000 and rapidly increasing in value," and "capable of producing large yields of valuable crops and large profits to the owner when properly cultivated," and that, "because of his weakened physical and mental condition, he was induced to believe those representations" and to sign the notes in suit, which he would not have done had he been "in a healthy and normal condition"; that in truth and in fact said tract of land was, at the time and ever since said time, "of no market value whatever and wholly worthless for any purpose"; that promptly after discovering the "fraud hereinbefore described" the executors "duly tendered to said land company" a return to it of the contract so executed and "demanded a return and surrender to them" of the notes, "and notified said company of their election to disaffirm said contract and notes on account of the aforesaid fraudulent practices," and of the incapacity of John P. Coffey to transact business of any kind.

It is difficult to determine, from that portion of the defendant's answer, whether the defense intended to be pleaded was mental incapacity to contract, duress in obtaining the contract, fraud, failure of consideration, or rescission.

[1] As to what occurred at the time of the giving of these notes, only one witness testified; that being Mildred C. Coffey, executrix and codefendant. The name of Mildred C. Coffey appears on the notes in suit, not only as a signer with her husband, but also as an indorser with him. She testified that her husband and herself were out with one Elsinger and his daughter and another man whose name she did not know, driving about San

Benito both forenoon and afternoon of the first day they were at San Benito, and looked at a piece of land about a half mile north-east of San Benito. They first saw the west end of the land and noticed an irrigation ditch along it, which irrigation ditch was higher than the land. It was not under cultivation; but some grass was growing on it—dry,stunted, blackened grass. When they got back to the railroad car, Elsinger referred to the land; but Coffey was not able to talk to him that night, because he was completely exhausted and retired early. The following day, Coffey, Mrs. Coffey, Elsinger, and others were again out in an automobile. The train left San Benito in the evening; and about 6 o'clock or earlier in the evening Elsinger asked Coffey and Mrs. Coffey to go into the private office at the end of the car, and they did; and he then asked Coffey if he would consider that the land was worth taking and if it would not be something he would want to make use of; and Coffey told him he was not ready to buy any land in Texas, and that he would not consider any land or make any contract or any agreement to take the land, which apparently ended the interview that evening. The next morning, Elsinger again came to the Coffeys and talked to them about it, and they again went into his private office, where he said that he was sure Coffey would be sorry if he let this opportunity go by to get this particular piece of land, that the land was very productive, and some time previously had produced enormous crops of cabbages and other garden trucks, and that, on account of its location, it would be particularly beneficial to his health, and at the same time would produce crops that would pay for the land itself and be very productive. He said it was worth $800 an acre. It was dur-ing this conversation that the notes in suit and the contract of purchase were signed. On cross-examination, she testified: That the ditches were on both sides of the farm, and they were higher on both sides, and the water could be run onto the land, but it was dry at the time. The first day they were at San Benito, she and her husband were out together in the forenoon and after-noon, but had dinner in the car. That it was one of those ex-cursions where they were taken down there for the sole purpose of looking at the country and buying land if they wished, and they understood that when they left Kansas City. She did not know how many went out to see the land, but there were five in

their car, and there were other cars out. On the second day, they were out again, and the next night they left. She also testified that her husband was a man who bought a great deal of land and had bought several pieces of land in Deuel county and in Minneapolis and some in North Dakota.

In addition to this testimony of Mrs. Coffey, there was also testimony to the effect that Coffey had been ill for several months, that, on the 16th day of January, approximately 40 days before the signing of these notes, he had made a will, and that approximately 40 days after signing the notes he died, and other testimony to show his physical and mental condition, which testimony does not need to be set out at length for the purposes of this opinion, for the reason that we do not consider herein the adequacy of the testimony to support the verdict for the defendants, if said verdict is based upon the mental incapacity of the deceased to enter into the contract; but, even though the answer could be held to have alleged, in addition to incapacity to contract, the defenses of duress and fraud and rescission, it is apparent from a review of the testimony that there was no sufficient evidence of fraud or duress or rescission based on fraud to go to the jury.

The task of determining the capacity or incapacity of a maker of a note to contract is sufficiently involved and burdensome when presented to the jury as the only issue of fact. The same is true when fraud or duress is the sole issue. Indeed the task of the trial judge in instructing the jury upon any one of those issues is not easy. When, in addition thereto, the issues are complicated by allegations of fraud and duress and rescission, as to some of which there is very slight proof, and as to others none at all, the burdens of both jury and trial judge are materially increased. The task of the trial judge, engrossed as he is, in the trial of such a suit, with the rules of evidence applicable to the issues raised by the pleading, when augmented by the responsibility of following the evidence so closely that he can decide, before instructing the jury, whether there has been sufficient evidence to support the various defenses alleged, is far from easy.

[2] He must decide, upon an inspection of the notes themselves, whether they were negotiable or nonnegotiable before he can determine whether or not the plaintiff is holder in due course or a mere assignee of a non-negotiable instrument, with all the

disabilities of such title, a question, incidentally, not raised, at least in this court, until respondent filed, for that purpose, a supplemental brief. He must pass upon the relevancy, materiality, and competency of evidence, and, in this case, its admissibility to sustain the defenses of incapacity, fraud, and duress. At the conclusion of the evidence, he must dictate to the court reporter his instructions to the jury, unless, while listening to the evidence and ruling upon objections thereto, he has theretofore prepared those instructions. It is not surprising, under such circumstances, that the learned trial judge, in instructing the jury in the case at bar, stated that one of the defenses thereto was the defense of fraud, and quoted verbatim and at length from that portion of the defendant's pleading, none too briefly summarized above, and which, as actually stated in the answer and instruction, consisted of over sixteen folios filled with persuasive language relating to fraud and duress and rescission, as to some of which no evidence whatever was given. We believe this to be reversible error, for the jury is entitled to have presented to it clear-cut issues and only such issues as the evidence supports; and, by the same token and to the same end, the trial judge is entitled to have the issues clearly defined by the pleadings, and not be compelled to speculate as to which of the defenses hinted at is or are the defenses relied upon.

[3]    In Blashfield's Instructions to Juries, vol. 1, p. 207, that eminent author says:

"The pleadings often contain allegations which find no support in the evidence. By reading these matters to them, the jurors are likely to be confused.

"Instructions should refer the jury to the evidence and not to the pleadings."

And this court has said:

"A court is not authorized to submit to a jury an issue as to which there is no evidence, and such submission by the court constitutes reversible error." Sheffield v. Eveleth, 17 S. D. 461, 97 N. W. 367; Haggarty v. Strong, 10 S. D. 585, 74 N. W. 1037.

And:

"Even though an issue is raised by the pleadings, it is not proper to give an instruction thereon, although it may be abstractly correct, where there is no basis for it in the evidence. It is the duty of the court to confine itself to a statement of such principles

of law as are applicable to the evidence received in support of the contentions of the parties, and thus to aid the jury in arriving at a correct determination of the issues involved. If an instruction is not thus based on the evidence, it is erroneous, in that it introduces before the jury facts not presented thereby, and is well calculated to mislead and induce them to suppose that such a set of facts, in the opinion of the court, was possible under the evidence and might be considered by them." 14 R. C. L. 786, "Instructions," § 51.

[4] For the foregoing reason, the judgment and order appealed from must be reversed. Various other assignments of error have been presented, but, inasmuch as a new trial must be had herein, we will consider only one other question; that being whether, as respondent contends, these notes are nonnegotiable on account of their interest provision as follows:

"With interest at the rate of 6 per cent per annum from date if paid when due; if not paid when due, 8 per cent from date."

This question is vital to the determination of the rights of the parties; for, if the plaintiffs are holders of nonnegotiable paper, "their rights are to be determined by the rules of law applicable to such instruments." Stebbins v. Lardner, 2 S. D. 127, 137, 48 N. W. 847, 849.

Respondent contends that the notes are nonnegotiable, relying on Hegeler v. Comstock, 1 S. D. 138, 45 N. W. 331, 8 L. R. A. 393. Prior to the enactment of the Negotiable Instruments Law of this state, this case was frequently cited with approval by this and other courts. This decision was followed by the Supreme Court of Oklahoma, beginning in territorial days. Indeed, that court in its first hearing of Union National Bank v. Mayfield (Okl. Sup.), 169 P. 626, held a note containing an interest provision not unlike that of the notes in suit to be nonnegotiable. But, upon a rehearing, the Oklahoma court handed down an opinion in 1918 (Union National Bank v. Mayfield, 71 Okl. 22, 174 P. 1034, 2 A. L. R. 135) which has become a leading case on the proposition that such an interest provision does not render a note nonnegotiable. In the fourth edition of Brannan's Negotiable Instruments Law, the decision reported in 174 Pacific is approved; whereas, in the third edition, the decision reported in 169 Pacific was disapproved. In the second edition of Joyce's Defenses to

Commercial Paper, on page 19, it is cited as an authority on the proposition that "a provision for the reduction of the rate of interest if the note is paid on or before maturity does not destroy the negotiability of the note." It is quoted at length in Capital City State Bank v. Swift (D. C.), 290 F. 505, both as to the development of the law with reference thereto and with reference to section 2 of the Uniform Negotiable Instruments Act (Rev. Code 1919, § 1706), and an annotation to the report of the decision in 2 A. L. R. 135, the third subdivision of which, on pages 141-144, is upon the specific point involved in the case at bar, sums up the whole matter in the following language:

"According to the weight of authority, neither a provision that a note bearing no interest if paid at maturity shall bear interest from date if it is not so paid, nor a provision that it is to bear a higher rate from date if not paid at maturity, or a lower rate than that therein specified if paid at maturity, renders it nonnegotiable."

It would appear, therefore, that the only reason for not now holding a note containing an interest provision like the notes in suit negotiable is the reason which caused Judge Kellam to concur in Hegeler v. Comstock, namely, the rule of stare decisis. Even that reason no longer exists; for this court, in Commercial Credit Co. v. Nissen, 49 S. D. 303, 207 N. W. 61, while not referring directly to the case of Hegeler v. Comstock, supra, but specifically referring to the later case of National Bank of Commerce v. Feeney, 12 S. D. 156, 80 N. W. 186, 46 L. R. A. 732, 76 Am. St. Rep. 594, which followed the Hegeler Case, has aligned itself with those courts which hold such notes to be negotiable within the meaning of section 1706, Rev. Code 1919, as well as section 2, Negotiable Instruments Act.

For the reason first herein discussed, the judgment and order appealed from are reversed, and the cause remanded for a new trial.

CAMPBELL, P. J., and GATES, POLLEY, SHERWOOD, and BURCH, JJ., concur.